IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| ANTHONY NESBIT, | ) | CIVIL NO. 03-00455 SOM/KSC |
| | ) | (Consolidated) |
| Plaintiff, | ) | |
| | ) | ORDER GRANTING IN PART AND |
| vs. | ) | DENYING IN PART DEFENDANTS' |
| | ) | MOTION FOR SUMMARY JUDGMENT |
| STATE OF HAWAII DEPARTMENT OF | ) | |
| PUBLIC SAFETY, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| WILLIAM J. KOTIS, | ) | CIVIL NO. 04-00167 SOM/LEK |
| | ) | (Consolidated) |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| STATE OF HAWAII DEPARTMENT OF | ) | |
| PUBLIC SAFETY, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Before the court is Defendants' motion for summary judgment

("Motion") in these consolidated prisoner civil rights actions.[1]

*Pro se* plaintiffs Anthony Nesbit and William J. Kotis

---

[1] Nesbit names the Hawaii Department of Public Safety
("DPS"), James L. Propotnick, Frank Lopez, Edwin Shimoda, Nolan
Espinda, Eric Tanaka, Randy Asher, Saia Finau, Cinda Sandin,
Monica Lortz, Cheryl Zembik, Lyle Kanoa, George Sheridan, David
Apao, the Attorney General of the State of Hawaii ("Attorney
General"), the Hawaii Department of Accounting and General
Services ("DAGS"), and Doe Defendants 1-10.

Kotis names DPS, Propotnick, Lopez, Shimoda, Espinda,
Tanaka, Asher, Sandin, Zembik, Ted Sakai, John F. Peyton, Clayton
Frank, Gary Kaplan, and Doe Defendants 1-10.  The court refers to
all defendants collectively as "Defendants."

(collectively, "Plaintiffs") are Hawaii prisoners currently incarcerated at the Tallahatchie County Correctional Facility ("TCCF") in Tutwiler, Mississippi.  Plaintiffs have filed an opposition to the Motion ("Opposition") and request that the court consider their earlier documents and exhibits submitted in opposition to Defendants' previous motion for summary judgment. Defendants filed a Reply.  The court considers the entire record in deciding this Motion.

The court GRANTS IN PART AND DENIES IN PART Defendants' Motion for Summary Judgment.  In Nesbit's action, the court GRANTS summary judgment to all remaining Defendants. This order disposes entirely of Nesbit's action.

In Kotis's action, the court GRANTS summary judgment to Defendants DPS, Propotnick, Lopez, Shimoda, Espinda, Tanaka, Asher, Sandin, Peyton, Frank, and Kaplan.  The court DENIES Defendants' Motion as to Defendant Zembik only.

BACKGROUND

The facts in these consolidated actions have been set forth in this court's previous orders.[2]  The court summarizes here each Plaintiff's claims and relevant facts, based on the full record in these cases.

---

[2] See "Order Dismissing Claims for Injunctive Relief and Denying Defendants' Motion for Summary Judgment as to Eighth Amendment Claim," issued April 18, 2005 ("April 18 Order").

On February 12, 2003, Defendant Monica Lortz assigned Nesbit to the Halawa Special Needs Facility ("HSNF"), Module C, at Halawa Correctional Facility ("HCF"). Nesbit's housing assignment was determined by his close custody status, which in turn was determined by the violent nature of his crime and/or the length of his mandatory minimum sentence. (See Motion, Kaplan Dec. ¶¶ 5, 6.) Lortz states that the memorandum transferring Nesbit to HCF contained no notation regarding gang affiliation or other special needs. (Id. Lortz Dec. ¶ 3.)

Nesbit alleges that gang members assaulted him in his cell the next day, February 13, 2003. Nesbit did not report this alleged assault to prison officials. On February 17, 2003, however, Nesbit filed Grievance No. 91664, complaining generally about the "coercive conditions" prevailing where he was housed. He also wrote a letter that day to HCF Warden Nolan Espinda, asking to be separated from gang members. Neither of these documents mentions the alleged assault of February 13, 2003.

Nesbit says that he was threatened by a gang leader on or about February 18, 2003. Nesbit reported this threat to prison officials on February 19, 2003, and was immediately removed from Quad 1, where his cell was. That same day, Adult Correctional Officer ("ACO") David Apao investigated the incident with HCF Case Manager Cheryl Zembik. Residency Section Supervisor Cinda Sandin then placed Nesbit in administrative segregation. Prison

officials moved Nesbit to protective custody twenty days later, where he remained until June 2004, when he declined further protective custody status during the period before he was transferred to Mississippi.

On September 11, 2002, Lortz assigned Kotis to HSNF, Module C. Kotis was classified as close custody based on the violent nature of his crime and/or the length of his sentence. Kotis says that he feared for his safety on his arrival, after gang members questioned him in a hostile and threatening manner.[3] Kotis alleges that, approximately six days later, gang members physically and sexually assaulted him, while other gang members laughed at and threatened him. He claims that he spoke with Zembik one week later and told her about the assault, but did not mention the sexual assault because he was ashamed. Kotis alleges that he told ACO Edward Rogish about the threats and alleged attack.[4] Both Rogish and Zembik deny that Kotis alerted them to his fears or to this alleged assault. (See Defs.' Mot. for Sum.

---

[3] In Grievance No. 86632, filed on October 29, 2002, Kotis described himself as having been afraid to be sent to HCF from the day he was convicted, long before he was sent to HCF. Kotis says that he voiced his fears to his attorney, his family, the prosecutor, the sentencing judge, and many others before he was transferred to HCF. In this grievance, Kotis states that he had "serious problems with a lot (sic) of people at Halawa many of which are in organized gangs, as well as several of the NOs and that there is a constant risk of harm to my life."

[4] ACO Rogish is not a party to Kotis's action.

4

Judgment, filed Feb. 18, 2005, Exs. D and F, Zembik and Rogish Decs.)

Several weeks later, on October 29, 2002, Kotis filed Grievance No. 86632 with Sandin.  The grievance concerned the threats and alleged assault.  Sandin responded that Kotis should notify staff if he felt threatened by any particular inmate.  It is unclear whether Sandin and Kotis met in person, but Sandin does indicate that Kotis refused protective custody and was transferred to a different cell the day after he submitted his grievance, at his request.  (Mot., Sandin Dec.)

On November 11, 2002, Kotis claims he was assaulted by his new cellmate, Richard Rosario, described by Kotis as a gang member.  Kotis reported the assault to an ACO, was immediately examined and treated by the prison nurse, and filed a police report.  Kotis was then placed in a special holding cell and was later moved to protective custody, where he remained until June 2004, when he was transferred to TCCF, in Mississippi.

## LEGAL STANDARD

Summary judgment shall be granted when

the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c); see also Porter v. Cal. Dep't of Corr., 419 F.3d 885, 891 (9th Cir. 2005); Addisu v. Fred Meyer, Inc.,

198 F.3d 1130, 1134 (9th Cir. 2000).  One of the principal
purposes of summary judgment is to identify and dispose of
factually unsupported claims and defenses.  <u>Celotex Corp. v.
Catrett</u>, 477 U.S. 317, 323-24 (1986).

Summary judgment must be granted against a party that fails
to demonstrate facts to establish what will be an essential
element at trial.  <u>See</u> <u>id.</u> at 323.  A moving party without the
ultimate burden of persuasion at trial--usually, but not always,
the defendant--has both the initial burden of production and the
ultimate burden of persuasion on a motion for summary judgment.
<u>Nissan Fire & Marine Ins. Co. v. Fritz Cos.</u>, 210 F.3d 1099, 1102
(9th Cir. 2000).  The moving party must identify for the court
"those portions of the materials on file that it believes
demonstrate the absence of any genuine issue of material fact."
<u>T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n</u>, 809 F.2d
626, 630 (9th Cir. 1987) (citing <u>Celotex Corp.</u>, 477 U.S. at 323).

"When the moving party has carried its burden under Rule
56(c), its opponent must do more than simply show that there is
some metaphysical doubt as to the material facts."  <u>Matsushita
Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986)
(footnote omitted).  The nonmoving party may not rely on the mere
allegations in the pleadings and instead "must set forth specific
facts showing that there is a genuine issue for trial."  <u>Porter</u>,
419 F.3d at 891 (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477

U.S. 242, 256 (1986)).  "A genuine dispute arises if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>California v. Campbell</u>, 319 F.3d 1161, 1166 (9th Cir. 2003); <u>Addisu</u>, 198 F.3d at 1134 ("There must be enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion.").

When "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." <u>T.W. Elec. Serv.</u>, 809 F.2d at 631.  In other words, evidence and inferences must be construed in the light most favorable to the nonmoving party. <u>Porter</u>, 419 F.3d at 891.  The court does not make credibility determinations or weigh conflicting evidence at the summary judgment stage. <u>Id.</u> However, inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party. <u>T.W. Elec. Serv.</u>, 809 F.2d at 631.

**ANALYSIS**

The central premise advanced by Nesbit and Kotis is that the HCF housing policy, which separates rival gang members from each other while housing non-gang members with the separated gang members, is unconstitutional.  Nesbit and Kotis describe

themselves as non-gang members and argue that Defendants were or should have been aware of a known risk of serious harm in housing gang members with non-gang members. Nesbit and Kotis claim that the HCF housing policy violates their right to equal protection under the law by discriminating between gang and non-gang members in housing decisions.

The court has previously determined that the claims asserted by Nesbit and Kotis with respect to having been transferred to HSNF do not implicate the Fourteenth Amendment. Housing claims do not rise to the level of a protected liberty interest. See Findings and Recommendation to Deny Defendants' Motion to Dismiss, entered Jan. 28, 2004, at 8 ("F&R"), adopted Feb. 20, 2004. This court has already ruled that Plaintiffs' claims arise under the Eighth Amendment, which requires prison officials to take measures to protect inmates from harm. Id. 8-9. However, Plaintiffs' claims appear to have evolved, with Plaintiffs now arguing that Defendants *discriminated* against them in their housing assignments, a subject not before the court earlier and therefore not discussed in the F&R. The court discusses this contention below.

Defendants move for summary judgment, arguing first that only persons directly involved with Nesbit's and Kotis's respective housing assignments, specifically Lortz and Sandin, can be held liable for Plaintiffs' alleged harms. Defendants

8

then argue that neither Lortz nor Sandin was deliberately indifferent to either Nesbit's or Kotis's safety when the initial housing decisions were made. Defendants recognize that Kotis also alleges that Zembik was aware of his fears and did nothing to protect him.

Defendants further contend that Nesbit and Kotis have failed to show culpable involvement by any of the remaining individual defendants in either a supervisory or any other capacity.

I.    The HCF Housing Policy Does not Violate The Equal Protection Clause.

Nesbit and Kotis contend that the HCF housing policy violates the Equal Protection Clause of the Fourteenth Amendment because it protects rival gang members from each other, while failing to afford the same protection to non-gang members from gang members.

The Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection of laws." U.S. Const. amend XIV, § 1. However, a statute or regulation that "neither burdens a fundamental right nor targets a suspect class" does not violate the Equal Protection Clause if the "classification . . . bears a rational relation to some legitimate end." Romer v. Evans, 517 U.S. 620, 631 (1996). To state a § 1983 claim based on a violation of the Equal Protection Clause, a plaintiff must show that the defendant discriminated against the plaintiff or against a class of inmates that included

9

the plaintiff.  <u>Village of Willowbrook v. Olech</u>, 528 U.S. 562, 564 (2000); <u>Reese v. Jefferson Sch. Dist. No. 14J</u>, 208 F.3d 736, 740 (9th Cir. 2000); <u>Barren v. Harrington</u>, 152 F.3d 1193, 1194 (9th Cir. 1998).  "A plaintiff must allege facts, not simply conclusions, that show that an individual was personally involved in the deprivation of his civil rights."  <u>Barren</u>, 152 F.3d at 1194.

The HCF housing policy neither targeted a suspect class, discriminated against Nesbit or Kotis, nor burdened a fundamental right.  First, the Ninth Circuit has held that inmates are not members of a suspect class.  <u>Webber v. Crabtree</u>, 158 F.3d 460, 461 (9th Cir. 1998).  Further, gang membership, or the lack of membership, bears none of the "traditional indicia of suspectness . . . [so as to warrant] extraordinary protection from the majoritarian political process."  <u>San Antonio Indep. Sch. Dist. v. Rodriguez</u>, 411 U.S. 1, 28 (1973).  Nesbit and Kotis, inmate non-gang members, fail to demonstrate that they are members of a suspect class.

Second, Nesbit and Kotis allege no facts supporting a finding that Defendants discriminated against them through housing assignments.  The undisputed facts show that Nesbit's and Kotis's housing assignments were made strictly on the basis of their close custody status, as are all housing assignments at HSNF.  (<u>See</u> Motion, Kaplan Dec. ¶ 5.)

Finally, as the F&R stated, Nesbit and Kotis do not have a fundamental constitutional right to be housed in the institution of their choice, or in a specific area of any particular institution.  See Meachum v. Fano, 427 U.S. 215, 224 (1976) (no constitutional right to be housed at a particular institution within the state); Grayson v. Rison, 945 F.2d 1064, 1-67 (9th Cir. 1991) (no constitutional right to be housed in a less restrictive section of a facility); see also Olim v. Wakinekona, 461 U.S. 238, 244-45 (1983) (no right to a particular state).[5] Therefore, a prison housing policy aimed at separating rival gang members from each other, with the stated aim of decreasing violence, does not violate the Equal Protection Clause if the policy bears a rational relation to a legitimate end.  The court concludes that it does.

No one contests the grave security risk posed by prison gangs.  See Madrid v Gomez, 889 F. Supp. 1146, 1240-1241 (N.D. Cal. 1995) (extensive discussion of prison gang activity in California).  The evidence before this court shows that the purpose of the HCF housing policy was to decrease violence at the prison between rival gang members, and that this policy has been successful, at least within the general population. (See Motion,

---

[5] This is not to say that Nesbit and Kotis do not have a fundamental right to be protected from assaults by other inmates. However, this "failure to protect" claim is, as the court previously held and discusses below, more properly analyzed under the Eighth Amendment.

Kaplan Dec. ¶¶ 9-12).  As close custody inmates are generally considered more violent than other inmates, it would surely be irrational for prison officials to separate rival gangs in the general population at HCF and then to fail to separate rival gangs from each other within the HSNF.  (Id. ¶¶ 11-12.)  Nesbit and Kotis do not establish that, in the absence of specific separatee issues or inmate requests, it was irrational for prison officials to house non-gang members with gang members who have been separated from rival gang members.  Defendants explain that experience showed that violence between gang members and non-gang members was "no higher than the incidence of violence generally."  Given these circumstances, the housing policy bears a rational relationship to a legitimate penological interest--inhibiting violence at the prison.  (Id. ¶ 10.)

     This is the type of decision that must be left to prison administrators and is precisely the situation discussed by the Supreme Court in Bell v. Wolfish, 441 U.S. 520, 547 (1979):

> [T]he problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions.  Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.

Defendants' motion for summary judgment, insofar as it addresses Plaintiffs' equal protection claim, is GRANTED.

II.  Plaintiffs' Eighth Amendment Claims.

Nesbit and Kotis claim that the HCF housing policy is unconstitutional because it fails to protect them, as non-gang members, from gang members.  These claims arise under the Eighth Amendment, which requires that prison officials take reasonable steps to ensure the safety of inmates.  See Farmer v. Brennan, 511 U.S. 825, 834 (1994).  Specifically, officials have a duty to protect inmates from violence at the hands of other inmates.  Id. at 833.  "Having incarcerated 'persons [with] demonstrated proclivit[ies] for antisocial criminal, and often violent, conduct' . . . [and] having stripped [inmates] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course."  Id. (citations omitted).

A prison official only violates the Eighth Amendment when two requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious, and (2) the official is, subjectively, deliberately indifferent to the inmate's safety. Id. at 834.

To be liable for failure to prevent harm, the official must know of and disregard an excessive risk to inmate safety.  Id. at 837.  The official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and must also draw the inference.  See id.  The official

13

need not "believe to a moral certainty that one inmate intends to attack another at a given place at a time certain before [he] is obligated to take steps to prevent such an assault." <u>Berg v. Kincheloe</u>, 794 F.2d 457, 459 (9th Cir. 1986). Before being required to take action he must, however, have more than a "mere suspicion" that an attack will occur. <u>See</u> <u>id.</u> 459-60 (summary judgment appropriate when plaintiff "failed to come forward with any facts showing that these defendants had any reason to believe he would be attacked by the assailant").

When a prisoner seeks money damages for a defendant's deliberate indifference, the "inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." <u>Leer v. Murphy</u>, 844 F.2d 628, 633 (9th Cir. 1988). As <u>Leer</u> explains:

> When plaintiffs . . . seek to hold an
> individual defendant personally liable for
> damages, the causation inquiry between the
> deliberate indifference and the eighth
> amendment deprivation must be more refined.
> [The court] must focus on whether the
> individual defendant was in a position to
> take steps to avert [the harm], but failed to
> do so intentionally or with deliberate
> indifference. In order to resolve this
> causation issue, [the court] must take a very
> individualized approach which accounts for
> the duties, discretion, and means of each
> defendant. . . . Especially when, as in this
> case, a prisoner seeks to hold a prison
> employee individually liable because another
> prisoner attacked him, the prisoner must
> establish individual fault. . . . Sweeping

14

> conclusory allegations will not suffice to
> prevent summary judgment. . . .   The prisoner
> must set forth specific facts as to each
> individual defendant's deliberate
> indifference.

Id. at 633-34 (internal citations omitted).

> A.    Nesbit and Kotis Do Not Establish that the Housing
>       Policy Is Unconstitutional.

In support of their claim that Defendants knew or should
have known that the HCF housing policy was unconstitutional,
Nesbit and Kotis supply their own statements and grievances, as
well as declarations from other inmates, protesting the HCF
housing policy and complaining of their fear and intimidation by
gang members.  As requested, the court takes notice of all of the
declarations in support of Plaintiffs' claims found in the
record.  Those declarations are summarized below.

Inmate Pele Faumuina's April 9, 2004, declaration states
that he was transferred to HCF in November 2003.  Faumuina claims
that he was beaten by gang members because he "did not live up to
the prison gang expectation." (Pls.' Opp., Group Exs. B, Faumuina
Dec. and Grievance; see also Pls.' Opp., filed Mar. 23, 2005, to
Defs.' First Mot. for Sum. Judg., Group Exs. 3, Faumuina
Grievance.)  Faumuina admits that prison officials then placed
him in protective custody.

Inmate Joseph Kamekona Williams Kapela, Jr., states that he
has served sixteen years of a twenty-year sentence.  (Pls.' Opp.,
Group Exs. B, Kapela Dec.)  Since Kapela's incarceration, he says

15

that he has seen gang activity rise at the prison, and that he
has personally witnessed gang members "mob a inmate! Nick Name
Star."[6] (Id. at 2.) Kapela says that he was also "mobbed" by gang
members, but he does not detail when this alleged assault
happened, whether he reported the incident, or what the outcome
was.  Kapela says that prison officials told him to "[j]ust live
with the gangs!"  (Id.)

Inmate Evan Marcus's declaration states that he arrived at
HCF in August 2003.  Marcus claims that he asked for protective
custody but was told that "he shouldn't do that because there's
no programs in 'P.C.', and that I will have to 'give up some
names' for P.C.'"  (Id., Marcus Dec. 1; see also Pls.' Opp.,
filed Mar 23, 2005, to Defs.' First Mot. for Sum. Judg., Group
Exs. 3, Marcus Inmate Injury Report.)  Marcus was first put in
the mental health facility at HSNF.  He says that he was beaten
there, put on therapeutic lockdown, and then sent to the HCF
Medium Facility, where he felt threatened by gang members.  After
several days of feeling threatened, Marcus was put in protective
custody.  (Pls.' Op., Group Exs. B, Marcus Dec. 2-3.)

Inmate William S. Aholelei states that he was assaulted by
gang members on October 3, 2003.  (Id., Aholelei Dec; see also
Pls.' Opp., filed Mar. 23, 2005, to Defs.' First Mot. for Sum.
Judg., Group Exs. 3 Aholelei Grievance.)  Aholelei filed a

---

[6] "Star" is apparently inmate William Aholelei, Jr.'s
nickname.

16

federal suit regarding this assault and prison officials' alleged
failure to protect him.  See Aholelei v. Hawaii, Civ. No. 04-
00414 SOM/KSC.  This court, finding that Aholelei had failed to
notify prison officials of his fear prior to the assault,
dismissed the action on the defendants' motion for summary
judgment.  See id., Order Granting Defendants' and Third-Party
Plaintiffs' Motion for Summary Judgment, entered December 6,
2005, attached to Defs.' Mot. as Ex. A.

Inmate Robin M. Milarii entered HSNF in June 2003.  (See
Nesbit's Dec., filed Feb. 25, 2004, with Milarii "letter"
attached; see also Nesbit's Reply Mem., filed Mar. 24, 2004,
Milarii Dec.)  Milarii claims that he notified the prison that,
because he was an informant, he was afraid to be transferred to
the HCF Medium Facility.  Milarii alleges that despite this, he
was transferred to the HCF Medium Facility, and was threatened by
gang members.  He reported these threats to the prison and was
transferred to a different "Quad."  Milarii claims that he was
threatened at the new Quad by different gang members.  He again
notified the prison and was then transferred to protective
custody.

Milarii filed two declarations in support of Defendants'
previous motion for summary judgment.  (See Defs.' Mot. Sum.
Judgment, filed Feb. 18, 2005, Exs. H, I.)  In those
declarations, Milarii averred that both Nesbit and Kotis told him

17

that they "were not really assaulted by gang members at the
Halawa Correctional Facility, but [] pled that [they] were in
order to keep [their] lawsuit from being dismissed[.]"  (<u>Id.</u> Ex.
H ¶ 5, Ex. I. ¶ 7.)  Nesbit and Kotis filed declarations
disputing Milarii's claims.  (<u>See</u> Pls.' Opp., filed Mar. 23,
2005, to Defs.' Mot. Sum. Judg.)

Inmate Alan Tagatac was placed in protective custody at HSNF
in February 2004, immediately upon his arrival at HCF.  He says
that, although he was willing to be placed in the general
population, his family convinced him to request protective
custody because of problems he had had with gang members the
previous year.  Those problems related to several alleged attacks
on Tagatac by gang members, which Tagatac says he did not report
to "Authority" out of fear of retaliation. (Nesbit's Reply Mem.,
filed Mar. 24, 2004, Tagatac Dec. Ex. A-4.)  It is unclear
whether these alleged assaults occurred while Tagatac was in
prison or while he was out of prison.  It is clear, however, that
he alerted HCF authorities of his fears prior to placement,
requested protective custody, and was so assigned.

These declarations, viewed in the light most favorable to
Nesbit and Kotis, set forth a pattern of gang intimidation of
certain non-gang members.[7]  There are several inescapable

_____

[7] Plaintiffs also state that they would have supplied fifty
to one hundred more grievances by other inmates detailing gang
assaults against non-gang members, but are unable to do so as
these records are confidential.  (Pls.' Opp. at 9.)  Nesbit

conclusions, however, that these statements also show, which Nesbit and Kotis fail to counter.  First, with the exception of Inmate Kapela's declaration, which is vague as to dates and details, these declarations concern transfers to HCF  months after Nesbit and Kotis arrived, months after the incidents at issue in the present actions, and well after both Nesbit and Kotis were placed in protective custody.  None of these statements is from any non-gang inmate who experienced gang member intimidation or violence prior to Nesbit's or Kotis's arrival at HSNF.  These inmates' declarations, therefore, do not establish that Defendants knew or should have known of, and were deliberately indifferent to, an "inherent danger" to Nesbit and Kotis when they were transferred to HSNF.

Second, according to these statements, excepting again Kapela's, the inmates were either immediately transferred to a different cell or placed in protective custody upon request. Inmate Tagatac was placed in protective custody immediately on his transfer to HSNF, despite his admission that he had not notified any "Authority," prison or otherwise, of the alleged gang member attacks from the previous year.  Tagatac also states

alleges that HCF Grievance Specialist Bob Webb told him that the prison received about a dozen grievances per year complaining about the HCF housing practice.  (Id.)  Nesbit calculates that this means there are at least 36 grievances for the three years prior to his transfer to HCF.  Plaintiffs do not provide Webb's signed, verified declaration, or any other admissible evidence of the speculated fifty to one hundred other assaults.

that he "decided to check in to P.C.," showing that this was his decision from the beginning.

Halawa prison officials, through experience, knew that separating rival gangs from each other decreased violence at the prison. (<u>See</u> Motion, Kaplan Dec. ¶ 8-10.)  Although the policy of separating rival gang members was evolving when Nesbit and Kotis arrived, there was always a system in place that allowed inmates to request a transfer to either protective custody or to another cell if they felt in danger.  (<u>See</u> <u>id.</u> ¶ 12-13; Sandin Dec. ¶ 5.)  This is consistent with Plaintiffs' own statements, Defendants' declaration, and the inmate declarations provided by Plaintiffs.

"Prisons are inherently dangerous institutions, and decisions concerning safety, order, and discipline must be, and always have been, left to the sound discretion of prison administrators."  <u>Lewis v. Casey</u>, 518 U.S. 343, 391 (1996); <u>Johnson v. California</u>, 543 U.S. 499, 515 (2005).  "[M]aintaining institutional security and preserving internal order and discipline" are the central goals of prison administration. <u>Bell</u>, 441 U.S. at 546.  Inmate housing assignments are basic security decisions best left to the sound discretion of prison authorities.

HCF had a viable, working system in place in which an inmate could notify the prison of his fears at any time and in which the

inmate would be either moved to a different cell or moved to protective custody, at the inmate's choice.  This system was in place when Nesbit and Kotis arrived at the prison and after, as their own evidence substantiates.  Kotis was offered this choice in 2002, and opted for a transfer to a different cell with a different cellmate.  When this proved insufficient, Kotis was immediately placed in administrative segregation, and then protective custody.

In 2003, Nesbit was admittedly moved immediately to protective custody on his request.  The undisputed facts show that Nesbit and Kotis were aware of the prison's system, and that prison officials, with the alleged possible exception of Zembik, discussed below, acted in accordance with the system in both of their cases.

Plaintiffs argue that "the mixing of prisoners who have demonstrated a propensity for violence in prison with those inmates who have not, has been known to be exposes [sic] to a known risk of harm in many case law."  (Pls.' Op. 20).  Nesbit and Kotis, however, had close custody status prior to their transfer to HSNF.  As Kaplan explains, "A Close Custody classification implies that the inmate may have a propensity toward violence and therefore requires a higher security setting."  (Mot., Kaplan Dec. ¶ 6.)  Kaplan states that Nesbit and Kotis "were classified as close custody due to the violence

of the crimes they had committed and were sentenced for and/or the length of the mandatory minimum sentence yet to be served." (Id.)  Mixing close custody non-gang members Nesbit and Kotis with close custody gang members exposed each of them to the same risk of harm.

Nesbit and Kotis cite eleven cases in support of their argument that it is constitutionally impermissible to house an "identifiable group of prisoners," non-gang members, with gang members.  These cases are neither Supreme Court nor Ninth Circuit cases and are, therefore, not binding on this court.[8]  Eight were decided before the Supreme Court's decision in Farmer v. Brennan, which set forth the standard for evaluating prison officials' liability for a failure to prevent harm to inmates.  The only cases cited by Plaintiffs that were decided after Farmer are three district court decisions, all inapposite.

---

[8] Most of these cases involved motions to dismiss, rather than motions for summary judgment.  Moreover, several of these cases, rather than supporting Plaintiffs' argument, militate in favor of granting Defendants' Motion, as they hold that deliberate indifference can only be found when the defendants specifically knew of the potential for assault against the plaintiff and took no steps to prevent it.  See, e.g., Vance v. Bordenkircher, 533 F. Supp. 429 (N.D. W. Va. 1982). In one of these cases, the appellate court specifically found that there was no constitutional violation because the defendants were not "reasonably apprise[d] . . . of the existence of the problem [prison violence] and the need for protective measures," despite a showing that there had been twenty-six assaults in the year the plaintiff was housed at the prison.  Murphy v. United States, 653 F.2d 637, 645 (D.C. Cir. 1981).

Plaintiffs cite Mayoral v. Sheahan, 1999 WL 1191431 (N.D. Ill. 1999), rev'd in part, 245 F.3d 934 (7th Cir. 2001).  The Seventh Circuit reversed this decision in part, specifically holding that the failure to implement a policy that segregated inmates by gang affiliation was not a constitutional violation, and that a prisoner must show both an objective risk of danger and that the defendants had actual knowledge of the risk as part of claim for deliberate indifference under either the Eighth Amendment or the Fourteenth Amendment.[9] Mayoral, 254 F.3d at 938 (citing Farmer, 511 U.S. at 842).  This case is clearly unhelpful to Nesbit and Kotis.

Plaintiffs' next cite Jones v. Sheahan, 2000 WL 1377114 (N.D. Ill. 2000).  The Jones court, applying the Farmer standard, stated, "It is not enough that a reasonable prison official would or should have known that the prisoner was at risk: the official must actually know of and disregard the risk to incur culpability."  Jones, 2000 WL 1377114, at *6.  "To prevail on a theory of 'gang targeting,' an inmate must show that the defendants 'either took no precautions to avoid a known hazard

---

[9] In so holding, the Seventh Circuit declined to extend the holding in Walsh v. Mellas, 837 F.2d 789 (7th Cir. 1988), another pre-Farmer case cited by Nesbit and Kotis, that the prison's failure to screen inmates being assigned to special housing units to ascertain gang-related activities could violate the Eighth Amendment.  The Seventh Circuit distinguished Walsh, noting that the plaintiff in that case was known to be someone targeted by a gang.  Mayoral, 254 F.3d at 939.

which the gang presented, or that the precautions they took ignored the risk which targeted inmates face.'" Id. (quoting Lewis v. Richards, 107 F.3d 549, 553 (7th Cir. 1997)).  The court found that Jones had sufficiently alleged that he, as a non-gang member, was an identifiable member of a group targeted by gang members, that he was attacked five times on this basis, and that defendants "knew of this risk and failed to take any precautions to address it." Jones, 2000 WL 1377114, at *7.  The court held that Jones had sufficiently stated a claim for his claims to proceed, noting that, "[w]hether Mr. Jones can prove all of this, of course, remains to be seen." Id.

       Except possibly with respect to Zembik, these facts differ significantly from the facts at issue here.  First, HCF took precautions to address the incidence of gang violence: HCF separated rival gang members, and, upon any inmate's request, would place that inmate in protective custody at any time. Second, this action is well beyond the stage of determining whether the allegations of Plaintiffs' complaints simply state a claim.  Nesbit's and Kotis's allegations were found to state a claim long ago and have proceeded for several years on that basis.  Jones is unavailing to Nesbit and Kotis.

       Nesbit's and Kotis's third post-Farmer case is similarly unhelpful to their cause.  In Pagan v. County of Orange, 2001 WL 32785 (S.D.N.Y. 2001), the court, applying Farmer, found that the

defendants were subjectively aware that an inmate who assaulted the plaintiff was mentally unstable, violent, posed a threat to other inmates, and was not receiving his mental health medications.  Id. at *4.  On that basis, the court denied defendants' summary judgment.  No analogous facts are before this court.

As this court previously noted, inmates have no constitutional right to be housed only with non-gang members, in the prison of their choice, or in a specific area of the prison.  See Meachum, 427 U.S. at 224 (no right to a particular institution); see also Olim, 461 U.S. at 244-45 (no right to a particular state); Grayson, 945 F.2d at 1067 (no right to less restrictive facility).  There is simply no constitutional principle forbidding prisons from housing gang members with non-gang members.  Inmates do, however, have the right to be protected from assaults by other inmates.  Prison officials have a duty and responsibility to take steps to prevent such assaults, where possible.  The HCF housing policy, as written and as implemented when Nesbit and Kotis were transferred to HCF, protected those rights and was not unconstitutional under the Eighth Amendment.

In addition to concluding that the policy was not unconstitutional, the court finds, as noted in detail below, that Nesbit and Kotis fail to show, with respect to most Defendants,

that they were deliberately indifferent to Nesbit's or Kotis's
safety.

    B.    With Respect To Most of the Individual Defendants,
          The Undisputed Facts Establish That they Were Not
          Deliberately Indifferent to Nesbit's or Kotis's Safety.

          1.    Summary Judgment is Granted to Propotnick, Lopez,
                Shimoda, Espinda, Tanaka, Asher, Sakai, Peyton,
                Frank, Kaplan, and Finau.

    Plaintiffs attempt to tie Defendants Propotnick, Lopez,

Shimoda, Espinda, Tanaka, Asher, Sakai, Peyton, Frank, Kaplan,

and Finau to their claims.  The court must look to the duties and

responsibilities of each of these Defendants, and the acts they

are alleged to have taken, to determine whether they were

deliberately indifferent to either Nesbit's or Kotis's

constitutional right to be protected from assaults by other

inmates.

    First, the evidence is undisputed that none of the above-

named Defendants took part in the decision to house Nesbit or

Kotis at HSNF with separated gang members.  The only named

Defendants who had any connection to the housing assignments in

issue on these motions were Lortz, Sandin, and, allegedly,

Zembik.

    Nesbit and Kotis argue, however, that Propotnick, Lopez,

Shimoda, Espinda, Tanaka, Asher, Sakai, Peyton, Frank, Kaplan,

and Finau are liable to them by virtue of either their positions

with DPS, or their signatures on various grievances that Nesbit

and Kotis wrote concerning their claims that the HCF housing policy was unconstitutional.  Plaintiffs state that "those defendants who have the power to abate this dangerous housing practice were made aware through [Plaintiffs'] grievances and have actual and constructive knowledge of the . . . challenged housing practice."  (Pls.' Opp. 2.)  Plaintiffs state that Espinda, Tanaka, Asher, Sandin, and Shimoda all signed their grievances at some point.  Plaintiffs also state that Peyton, Propotnik, and Lopez, as "senior prison officials," failed to "promulgate their statutory duties."[10]

As set forth above, when a prisoner seeks money damages for a defendant's deliberate indifference, the "inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation."  Leer, 844 F.2d at 633.

There are two theories under which a state official may be liable under § 1983 for actions or omissions in his or her individual capacity: (1) personal involvement in the act or omission that caused the injury; or (2) a sufficient causal connection between the official's acts or omissions and the

---

[10] Plaintiffs' Opposition does not set forth specific arguments or facts tying Sakai, Frank, or Kaplan, to their claims.  The court includes these Defendants in this analysis, relying on Kaplan's declaration, which states that they have supervisory positions with DPS.

injury.  There is no respondeat superior liability under § 1983.
<u>Taylor v. List</u>, 880 F.2d 1040, 1045 (9th Cir. 1989).  A
supervisor may be held liable for the constitutional violations
of subordinates if the supervisor "directed the violations, or
knew of the violations and failed to act to prevent them."
<u>Id.</u> at 1045.  If the state official was not personally involved
in the alleged constitutional deprivation, then a plaintiff must
show that the official "implement[ed] a policy so deficient that
the policy 'itself is a repudiation of constitutional rights' and
is 'the moving force of the constitutional violation.'"  <u>Redman</u>
<u>v. County of San Diego</u>, 942 F.2d 1435, 1446 (9th Cir. 1991).

Defendants Propotnick, Lopez, Shimoda, Espinda, Tanaka,
Asher, Sakai, Peyton, Frank, Kaplan, and Finau were not
personally involved in the decision to place Nesbit or Kotis,
based on their close custody classification, into HSNF.  Their
signatures on grievance appeals denying Nesbit or Kotis relief
based on Plaintiffs' belief that the HCF housing policy was
unconstitutional does not alter this fact.  As discussed above,
the HCF policy was neither a repudiation of constitutional rights
nor a moving force in any alleged constitutional violation here.
The court grants Defendants' Motion for Summary Judgment as to
Defendants Propotnick, Lopez, Shimoda, Espinda, Tanaka, Asher,
Sakai, Peyton, Frank, Kaplan, and Finau.

  2.  <u>Summary Judgment is Granted To The Attorney</u>
   <u>General.</u>

Nesbit and Kotis provide no facts supporting any claim against the State of Hawaii's Attorney General.  They do not allege that the Attorney General was involved in their assignment to HSNF, in the promulgation of the HCF housing policy, or in the events leading up to their alleged assaults.  Having scoured Plaintiffs' Opposition, Complaints, and the voluminous documents and declarations filed in support of these actions, the court finds nothing tying the Attorney General to Plaintiffs' claims that the prison failed to protect them from harm.  Summary judgment is granted as to claims against the Attorney General.

       3.   Summary Judgment is Granted to Kanoa, Sheridan, and Apao.

Defendants Kanoa, Sheridan, and Apao are HCF ACOs who indisputably played no part in the decision to transfer Plaintiffs to HSNF.  Plaintiffs do not show that these defendants were involved in any manner with the alleged assaults, other than to investigate their claims of assault, to make reports, and to move Plaintiffs into the special holding unit or to protective custody.  These actions do not constitute deliberate indifference to Plaintiffs' safety.  Summary judgment is granted to Kanoa, Sheridan, and Apao.

       4.   Summary Judgment is Granted to Lortz and Sandin.

Lortz was responsible for the initial housing assignments for both Nesbit and Kotis.  Lortz states that, when she assigned Nesbit and Kotis to their respective cells, she was following

department policy based on Nesbit's and Kotis's close custody status, lack of noted gang affiliation, and lack of notification of other special needs.  (Mot., Dec. 5, 2005, Lortz Dec.)  Lortz says that she expected both to be assigned to appropriately safe cells in Module C.

Lortz's declaration of November 29, 2005, differs from her declaration of December 5, 2005.  In the first, Lortz states that she expected Nesbit and Kotis to be assigned to "non-gang" cells within Module C.  (Nov. 29, 2005, Lortz Dec. ¶¶ 3,4.)  In the second, Lortz revises this statement, saying that she expected Nesbit and Kotis to be housed in "appropriately safe" cells and deleting any reference to "non-gang" cells.  (Dec. 5, 2005, Lortz Dec. ¶¶ 3,4.)

Defendants' attorney explains that, upon reflection, after filing the first declaration, "Lortz recalled that at the time of the Plaintiff[s'] housing assignment, the policy of separate gang and non-gang Quads had not yet been formalized; therefore, it was more accurate for the second declaration to speak only of an appropriately safe cell."  (Def.'s Suppl. Mem., filed Feb. 17, 2005, at 2.)  Defendants claim that both declarations are accurate as to Lortz's expectation that Nesbit and Kotis would be placed in a safe cell determined by their classification status and any special needs notifications in their files.

This discrepancy does not affect this court's conclusion that assigning a non-gang member to a cell where gang members are also housed is not, in and of itself, unconstitutional.  When Lortz assigned Nesbit and Kotis to their cells, she had no information that either one of them needed special consideration in any housing assignment.  Neither one had sought separatee status, or made any requests or statements to prison officials requiring special attention in housing assignments.  As Nesbit's and Kotis's own exhibits show, when an inmate indicated his fear of gang intimidation to prison officials before being transferred to HCF, he was placed in protective custody.  (See Nesbit's Reply Mem., filed Mar. 24, 2005, Tagatac Dec. Ex. A-4.)  Lortz's initial assignments of Nesbit and Kotis to Module C, based on their classification statuses and lack of other cautionary notations, whether she believed they would be assigned to a "non-gang cell" or to an "appropriately safe cell," did not violate the Eighth Amendment.  Summary judgment is granted to Lortz.

Sandin had no involvement at all with Nesbit's housing assignment.  She was responsible for Kotis's transfer to a different Quad within Module C, after he requested this transfer and declined protective custody.

Kotis was transferred to HCF on September 11, 2002.  He states that, "on or about the sixth day" after he arrived, gang members assaulted him in his cell.  (See Kotis Compl. Stmt. of

31

Cl. ¶ 6.)  Kotis claims that "a week later I talked to Sheryl
Zimbeck and told her about the fear and terror and assault."
(Id. ¶ 8.)  "[A]bout one month later," Kotis says that he filed
his first grievance concerning his fears of assault, and that
Sandin's response was "callous."  (Id. ¶¶ 10, 12; see also
Grievance No. 86632.)

     In this grievance, Kotis claims that he was afraid of being
at HCF long before he was transferred there, and that he made his
fears known to many people before the transfer, including "the
Probation Officer Chloe Pae, Sarah at the RAD unit, . . . Judge
Perkins and his entire court[,] . . . . [e]ven the Prosecutor's
Office."  (Grievance No. 86632.)  Kotis then complains that he
was moved too swiftly from intake to HSNF.  He asks to be
immediately moved from Module C to either Halawa Medium Security,
to a mainland facility without gang affiliations, or to
protective custody.  Kotis does not mention the assault that
allegedly occurred on or about September 17, 2002.

     Sandin's response to this grievance, which is the basis for
Kotis's claim that she acted with deliberate indifference to his
safety, states:

          The Module C Unit Team spoke extensively to
          you and you agreed to try the small quad in
          Module C before Protective Custody.  There
          was also a referral made to the Psychiatric
          Social Worker to evaluate you for possible
          placement in the Mental Health Unit in Module
          B.  Staff are monitoring your adjustment and
          they have instructed you to let them know if

> you feel threatened by any inmates in your
> immediate vicinity.

(Grievance No. 86632, Resolution, dated Nov. 8, 2002.)

Sandin states that "[o]n or about October 30, 2002[,] we moved William Kotis, at his request[,] to a different quad within Module C.  This move within Module C was made only after William Kotis declined protective custody.  Module C is the only Module available to house close custody inmates."  (Sandin Dec. ¶ 4, dated Dec. 2, 2005 .)  Sandin states that "[her] primary consideration was Kotis' safety.  He was not knowingly placed in harm's way."  (Id. ¶ 6.)  Kotis does not dispute this, nor is there any evidence before the court that Sandin placed Kotis with a cellmate that she had reason to believe would harm him.  When Kotis was allegedly assaulted by his cellmate several days later, he was immediately moved to special holding, and then, at his request, to protective custody until he was transferred to Mississippi.

Thus, upon hearing from Kotis of his fears, Sandin moved him to him another cell, as he requested after declining protective custody.  This set of circumstances does not support a finding of deliberate indifference to Kotis's safety.  Summary judgment is granted to Sandin.

This leaves Zembik as the only individual Defendant remaining in this case.  Claims against Zembik are addressed later in this order.

C.    Individual Defendants other than Zembik are
      Alternatively Entitled to Qualified Immunity With
      Respect to the Eighth Amendment Claims.

Defendants assert, in the alternative, that they are

entitled to qualified immunity.  This court agrees with respect

to all individual Defendants except Zembik.  While the discussion

above focuses on traditional summary judgment analysis to reach

the conclusion that Nesbit and Kotis fail to show how the

evidence they offer will establish the elements of an Eighth

Amendment claim, that same analysis establishes that Defendants

Propotnik, Lopez, Shimoda, Espinda, Tanaka, Asher, Sakai, Peyton,

Kaplan, Frank, Finau, the Attorney General, Kanoa, Sheridan,

Apao, Lortz, and Sandin are entitled to qualified immunity with

respect to Eighth Amendment claims.  Indeed, the summary judgment

analysis has been said to mirror the qualified immunity analysis.

In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court

set forth a two-step inquiry for determining whether qualified

immunity applies.  First, "[t]aken in the light most favorable to

the party asserting the injury, . . . the facts alleged [must]

show [that] the officer's conduct violated a constitutional

right."  Id. at 201.  This prong of the Saucier inquiry "mirrors

the substantive summary judgment decision on the merits."

Sorrels v. McKee, 290 F.3d 965, 969 (9th Cir. 2002).  "If no

constitutional right would have been violated were the

allegations established," the inquiry ends.  Saucier, 533 U.S. at

201.  If there appears to have been a constitutional violation,
however, the second step is to determine whether the right in
question was "clearly established . . . in light of the specific
context of the case, not as a broad general proposition."  Id.;
Walker v. Gomez,  370 F.3d 969, 974 (9th Cir. 2004).

     As noted earlier, the HCF housing policy of separating rival
gang members, while housing non-gang members with the separated,
rival gang members, is constitutional.  As detailed above, the
facts alleged do not show that Defendants Propotnik, Lopez,
Shimoda, Espinda, Tanaka, Asher, Sakai, Peyton, Frank, Kaplan,
Finau, the Attorney General, Kanoa, Sheridan, Apao, Lortz, and
Sandin violated Nesbit's or Kotis's Eighth Amendment rights.  To
the extent any of those Defendants did anything relating to
housing assignments, they simply implemented the HCF housing
policy that separated rival gang members from each other and
housed non-gang members with the separated rival gangs.  See
Saucier, 533 U.S. at 201.  Put another way, even if this court
considers the entire case file in these consolidated cases, and
not just the allegations in the Complaints, Plaintiffs do not
make out an Eighth Amendment violation against those Defendants.
Defendants Propotnik, Lopez, Shimoda, Espinda, Tanaka, Asher,
Sakai, Peyton, Frank, Kaplan, Finau, the Attorney General, Kanoa,
Sheridan, Apao, Lortz, and Sandin therefore have qualified

immunity with respect to the Eighth Amendment claims against them.

      D.    Defendant Zembik is Entitled to Summary Judgment with Respect to Nesbit's Claims Against Her, but Not with Respect to Kotis's Eighth Amendment Claims Against Her.

When Nesbit's claims against Zembik are analyzed under both the traditional summary judgment standard and the doctrine of qualified immunity, Nesbit's claims are clearly wanting.  Nesbit makes no showing that Zembik acted with deliberate indifference to his safety, as he admits that he was immediately moved to administrative segregation and then to protective custody after complaining to Zembik.  (See Nesbit Compl. Stmt. of Facts ¶¶ 36-41.)  Zembik is therefore entitled to summary judgment with respect to Nesbit's Eighth Amendment claims against him.

However, on the meager record before this court with respect to Kotis's claims against Zembik, a genuine issue of material fact exists as to whether Zembik was deliberately indifferent to Kotis's complaints.  Kotis alleged in his verified Complaint that he told Zembik that he had been assaulted in September 2002, and that Zembik did nothing.  (See Kotis Compl. Stmt. of Cl. ¶¶ 6, 8, and 11.)  Zembik says that she does not remember this conversation.  (Zembik Decl. ¶ 3, dated Feb. 17, 2005.)  Kotis says that, after he filed Grievance No. 86632, he  had a secret conversation with ACO Rogish in which the alleged assault was discussed.  Rogish, who is not a party to either of the

consolidated cases before this court, disputes this allegation. (Rogish Decl. ¶ 4, dated Feb. 18, 2005.)  Kotis says that, about an hour after his secret conversation with Rogish, he met with Zembik and Sandin, who agreed to move him to another Quad.  The move apparently occurred on or about October 30, 2002.

The discrepancies in the evidence about whether Kotis told Zembik about the alleged assault on September 17, 2005, and whether Zembik then failed to take steps to protect Kotis from further assaults create a genuine issue of material fact.  The record before the court does not indicate that Kotis sustained physical injury as a result of Zembik's alleged indifference (a matter which may affect the amount of any damage award, assuming Kotis establishes liability).  However, the papers before this court, read in the light most favorable to Kotis, assert that Kotis was in fear for a period after the alleged assault because Zembik allegedly did nothing, though she allegedly knew Kotis had been attacked.  Zembik is the only Defendant about whom there is some evidence, albeit vigorously disputed, that (1) she knew that Kotis had been assaulted and was seeking protection, (2) she was involved with transfer requests, and (3) she did nothing (at least for a time) despite knowing of the alleged danger and being in a position to provide a safer environment for Kotis.  The court is certainly not finding that these allegations are true. The court is, however, finding that there is a factual dispute as

to whether they are true.  Assuming the facts are as Kotis alleges, a question of fact exists as to whether Zembik violated Kotis's Eighth Amendment rights.

The court turns therefore, to the second prong of the Saucier qualified immunity analysis and examines whether Kotis's right to be protected from danger under those circumstances was clearly established.  Under the law cited previously in this order, Kotis's right was indeed clearly established.  If, as Kotis claims, Zembik knew that Kotis had been attacked and had refused to help Kotis even after he requested help, then Zembik had far more than a "mere suspicion" that Kotis was in danger. If, as Kotis claims, Zembik responded cavalierly and left Kotis in a situation that had proven dangerous, knowing that Kotis himself had no access to outside protection and was not allowed to have weapons with which to protect himself, Zembik violated clearly established rights.

Of course, the above analysis assumes that Kotis's version of what occurred is accurate.  Whether Kotis's version is indeed accurate is for the factfinder to determine.  The factfinder's determination will turn on whether the factfinder believes Kotis or Zembik.  That matter is left for trial.  The court DENIES summary judgment as to Kotis's Eighth Amendment claim against Zembik.

In so ruling, the court is in no way limiting the ruling
stated earlier in this order that Plaintiffs fail to establish
that the housing policy is unconstitutional.  The denial of
summary judgment to Zembik is instead premised on a factual
dispute as to whether Zembik followed the constitutional housing
policy.  The evidence before this court establishes that the
policy provided for transfers away from gang members, as deemed
appropriate by prison officials.  If, as Kotis alleges, Zembik
failed to consider his transfer request after learning that he
had allegedly been assaulted by a gang member, then Zembik was
violating the constitutional housing policy.

## CONCLUSION

Claims for damages against DPS and DAGS and against
Defendants sued in their official capacities, as well as all
claims for injunctive relief, were previously disposed of,
leaving only claims against Defendants sued in their individual
capacities.  Summary Judgment is GRANTED with respect to all
individual Defendants with respect to Plaintiffs' equal
protection claims.  Summary Judgment is GRANTED to Defendants
Propotnick, Lopez, Shimoda, Espinda, Tanaka, Asher, Sakai,
Peyton, Frank, Kaplan, Finau, the Attorney General, Kanoa,
Sheridan, Apao, Sandin, and Lortz with respect to Nesbit's and
Kotis's Eight Amendment claims against them.  Summary judgment is

also granted to Zembik with respect to Nesbit's Eighth Amendment claims against her.

These rulings dispose of Nesbit's action, Civil No. 03-455 SOM/KSC, in its entirety.  However, the Clerk of Court should wait until Kotis's case has been disposed of before entering judgment against Nesbit.

The only remaining claim before this court in these consolidated cases is the claim by Kotis in Civil No. 04-167 SOM/BMK that Zembik violated Kotis's rights under the Eighth Amendment.

In case the disposition of any claim remains unclear, and to avoid the possibility of any ambiguity in the record with respect to any claim, the court explicitly dismisses any claim that is not otherwise clearly disposed of, with the sole exception of

Kotis's Eighth Amendment claim against Zembik, which remains in issue.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, May 1, 2006.


_____
Susan Oki Mollway
United States District Judge


NESBIT v. DEP'T OF PUBLIC SAFETY, et al., CIV. NO. 03-00455 SOM/KSC; KOTIS v. DEP'T OF PUBLIC SAFETY, et al., CIV. NO. 04-00167 SOM/LEK (consolidated cases); ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT